UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GOODLOE MARINE, INC.,

       Plaintiff and Counter-
       Defendant,

v.

       Case No:  8:20-cv-679-JLB-AAS
       Case No:  8:20-cv-1641-JLB-AAS

CAILLOU ISLAND TOWING
COMPANY, INC., and B.C. TOWING,
INC.,

       Defendants and
       Counter-Plaintiffs.

_____

## **O R D E R**

These consolidated cases arise from the January 22, 2020 sinking of Plaintiff

and Counter-Defendant Goodloe Marine, Inc.'s ("Goodloe") Dredge, while under tow

by Defendant and Counter-Plaintiff Caillou Island Towing Company, Inc.'s ("CIT")

Tug in the Gulf of Mexico.  Before the Court is Goodloe's Motion for Partial

Summary Judgment (Doc. 194).  CIT has responded, and Goodloe has replied.  (Doc.

198; Doc. 201).  For the following reasons, Goodloe's Motion for Partial Summary

Judgment is **GRANTED in part** and **DENIED in part**.

## **FACTS**

On January 8, 2020, Goodloe and CIT entered into a Towing Agreement

under which CIT would tow Goodloe's Dredge and Idler Barge from Port Bolivar,

Texas to Port St. Lucie, Florida or Wilmington, North Carolina.  (Doc. 195-1).  The Tug—called the Charles J. Cenac—was owned by B.C. Towing[1] and chartered by CIT.  (Doc. 195-3 at 28; Doc. 198-1 at 12; Doc. 195-5 at 7).  Goodloe's Dredge was a sectional dredge that had at least three feet of linear distance—known as freeboard—between the waterline and the deck of the dredge when the vessel was sitting still.  (Doc. 195-6 at 4, 9; Doc. 195-4 at 7).  Goodloe is owned by Bettie Goodloe whose husband, Benton Goodloe, is Goodloe's project manager and general superintendent.  (Doc. 195-2 at 2).  Benton Goodloe's son, Benjamin Goodloe, was aboard the tow during the journey.  (Doc. 194-3 at 35).  To avoid confusion, the Court will refer to each member of the Goodloe family by their full name throughout this Order.

Prior to the voyage, Goodloe hired Captain Danny Duzich of RJA, Ltd. to perform a pre-departure Trip in Tow Survey.  (Doc. 195-7 at 9, 13; Doc. 195-5 at 8).  Captain Duzich inspected the tow and issued nine recommendations.  (Doc. 195-9 at 2–3).  Among these recommendations, Captain Duzich stated, "[f]avorable weather forecast to be obtained prior to departure from Carrabelle, Florida Sea Bouy for Boca Grande, Florida" and "[i]dentify Ports of Refuge and / or sheltered water, should weather conditions / sea state exceed three (3) feet during the voyage segment" during the voyage segment between Carrabelle, Florida and Boca Grande, Florida.  (*Id.* at 2).  Captain Duzich then issued a Trip in Tow Approval Certificate

---

[1] B.C. Towing was initially a party to this action but was terminated after the Court granted its Motion for Summary Judgment.  (*See* Doc. 101).

2

to which his recommendations were attached with the intention that the Tug rely on these recommendations during the voyage.  (Doc. 195-5 at 9; Doc. 195-7 at 43).

### 1.  The Beginning of the Voyage

Captain Andrew Adams—who was the captain of the Tug at the beginning of the voyage—reviewed Captain Duzich's Trip in Tow recommendations and signed the Approval Certificate but not the list of recommendations.  (Doc. 195-5 at 8–9; Doc. 195-3 at 32; Doc. 195-10 at 19; Doc. 195-12 at 13–14).  The tow commenced on January 8, 2020, leaving Port Bolivar, Texas around 1:00 p.m.  (Doc. 195-5 at 8).  The tow arrived at Port St. Joe, Florida on January 16, 2020.  (*Id.*)  There, Captain Adams was relieved by Captain Roger Taylor, but Captain Adams remained on board "acting as relief master."  (*Id.*)  Captain Taylor took the tow to Carrabelle, Florida, and once in Carrabelle, the crew waited for a period of good weather that would facilitate the portion of the voyage over open water to Boca Grande, Florida.  (*Id.*)

While in Carrabelle, the crew aboard the Tug was in frequent contact with Michael Arcement, CIT's "Human Resources / Safety / Designated Person" who was at CIT's headquarters in Houma, Louisiana.  (*See* Doc. 195-17 at 147; Doc. 195-3 at 35; Doc. 195-13 at 1–3; Doc. 195-10 at 34).  Mr. Arcement ensured that prior to departing Carrabelle, CIT "checked weather forecasts on NOAA both from shoreside and from the vessel crew's perspective."  (Doc. 195-3 at 34).  Mr. Arcement also testified that during this period of waiting, "[w]hat we did is we . . . just stayed in communication with . . . the boat and with Captain Duzich and . . . [Benton]

3

Goodloe." (Doc. 195-3 at 35). For example, on January 18, 2020, Mr. Arcement sent Captain Duzich the weather report that Captain Adams was reviewing to determine whether to leave Carrabelle. (Doc. 195-13 at 1). And in a separate email that day, Mr. Arcement told Captain Duzich, among others, that "we will monitor the weather closely and when we see our gap, we will make the crossing. We don't want to leave now with the cold front tonight." (Doc. 195-13 at 1–2).

### 2. Resumption of the Voyage

On January 20, 2020, Captain Taylor decided to resume the voyage. (Doc. 195-5 at 8). That day, forecasts issued by the National Weather Service ("NWS") advised "northeast winds at 15 to 20 knots and seas 2 to 4 feet during portions of the 5-day forecast period with choppy to moderate chop in protected waters" for the zone that the tow would be travelling through. (Doc. 195-15 at 3). On January 21, 2020, at 3:36 a.m., the NWS advised "wave heights of 3 to 5 feet with wind speeds of 20 knots for the overnight period of January 21 to 22, 2020." (*Id.*) The broadcasts issued later in the day on January 21, 2020 advised the same wave heights as well as an increase in wind speed to 25 knots. (*Id.*)

As the tow continued to travel south on January 21, 2020, the Tampa office of the NWS broadcast three urgent marine weather messages. (*Id.* at 4). All three messages advised seas of four to seven feet overnight in the zone of the Gulf that the tow was approaching, namely: "coastal waters from Tarpon Springs to Suwannee River." (*Id.* at 4, 10). Forecast conditions in zones of the Gulf to the west of the tow—closer to where the tow began its journey in Carrabelle—advised of seas

of one to two feet and two to three feet.  (*Id.* at 5, 10).  Thus, as Austin Dooley, an expert in meteorology and oceanography opined, "[a]t the time of the [Tampa] urgent marine weather messages issued on January 21, 2020, the forecasts for returning to Carrabelle were more favorable than proceeding toward Tampa."  (Doc. 195-15 at 5).

In the early afternoon on January 21, 2020, the Tallahassee office of the NWS broadcast an urgent marine weather message advising that between 7:00 p.m. on January 21, 2020 and 10:00 a.m. on January 22, 2020, there would be winds of 20 to 25 knots and seas of two to four feet in the zone of the Gulf that the tow had just arrived in.  (*Id.* at 5, 10, 12).  An hour later, the Tampa office of the NWS forecast "[n]orth winds around 20 knots increasing to 20 to 25 knots in the late evening and early morning, then diminishing to around 20 knots toward morning.  Seas 3 to 5 feet.  Bay and inland waters rough."  (Doc. 195-15 at 19).

Despite these messages, the tow proceeded on its voyage and continued to a zone of the Gulf approximately seven miles offshore from the Suwannee River.  (Doc. 195-16 at 2).  Shortly after midnight on January 22, 2020, the coupling at the stern barge failed, and the dredge and the barge parted.  (*Id.*; Doc. 195-14 at 17).  According to Roland Louis Campana, Sr., a seamanship expert, this occurred because waves affected the coupling by creating "pressure points," which the coupling was not designed for.  (Doc. 198-4 at 36.)  The crew on the tug tried to get the dredge into more shallow water, but the dredge began taking on water at around 6:00 A.M.  (Doc. 195-16 at 2).  By 3:00 P.M., the dredge was completely

submerged in water. (*Id.*; Doc. 195-14 at 17). As the dredge sank, the tow line between the dredge and the Idler Barge "came off" so that the dredge and the Idler Barge began separating. (Doc. 195-14 at 17). By 5:30 P.M., the Idler Barge had completely parted from the dredge. (*Id.*) CIT's Report of Marine Casualty submitted to the Coast Guard stated that there were seven-to-nine-foot seas at the time of the sinking. (Doc. 195-16 at 2).

Captain Taylor and Captain Adams had been trained with the CIT Safety Management Manual, which "requires the captain to ensure the safe navigation of the tug and the tow." (Doc. 195-3 at 13–14). According to this manual, when the tow encounters adverse weather conditions, the captain is required to take precautions to the "best of his ability" in order to "ensure . . . a safe transit." (*Id.*) CIT required its captains to undergo various trainings, but in January of 2020, CIT did not have a specific training on the evaluation of weather. (*Id.* at 15). At that time, CIT also was not using Navigation Assessment Forms, which are voyage plans reviewed on board which include reports on current water conditions and actions to take during heavy weather conditions. (*Id.* at 16–17).

### 3. Post Sinking Determinations

After the sinking, Captain Roger Shore, a master mariner and marine surveyor, investigated the dredge. (Doc. 195-5 at 1–4). Captain Shore testified that "[u]pon the Tug receiving unfavorable weather forecasts with seas exceeding 3 feet . . . the Tug's master should have sought shelter, whether it be turning back to the west toward Carrabelle, Florida or seeking other sheltered water, instead of

6

proceed[ing] onward toward[s] Tampa." (Doc. 195-5 at 3). Captain Shore added that "the Tug's actions were imprudent. A prudent mariner would not have forged ahead in light of the forecasted weather conditions along the planned route." (*Id.*) Benton Goodloe echoed Captain Shore's determination testifying, "the dredge never should have been out there in rough seas . . . [o]nce they left Carrabelle[,] if the weather got a little crappy they had the opportunity to turn around and go back." (Doc. 195-6 at 23–24).

In the course of this litigation, it was also determined that CIT never asked for weather reports from Continental Weather Corporation ("CWC")—a company which provides weather forecasts to CIT on a subscription-type, daily basis—for the gulf coast of Florida, which could have changed the course of their journey. (Doc. 195-18 at 3–5). Alan Mitleider, the President of CWC, testified that CIT had been a client of CWC's for almost twenty years and in January 2020 had asked for weather forecasts for coastal Mississippi and southeast Louisiana, but not for any part of Florida relevant to its voyage with Goodloe's dredge. (*Id.* at 3–5). Mr. Mitleider added that CWC could "tailor" its forecasts to "cover any routes" that its clients might be taking, and CWC had the capacity to send forecast updates to CIT for a route from Carrabelle, Florida to Tampa, Florida in January 2020. (*Id.* at 5). Further, Mr. Mitleider testified that if CIT had asked for such forecasts, CWC would have provided them at no extra cost on top of CIT's existing subscription. (*Id.* at 8).

Finally, inspections of the dredge after it sank revealed that the dredge was not properly watertight.  For example, Christopher Karentz, an expert surveyor who inspected the dredge after it sank, testified "when the vessel left Carrabelle, without any doubt whatsoever, the decks were not in a seaworthy condition. Meaning there were exposed openings that would allow flooding of the compartments.  The hatches were not watertight."  (Doc. 198-5 at 87).  And William Cenac, the President of CIT, testified that, "[i]n this particular case, this thing sunk like a brick.  There was no compartment that was watertight.  If this thing would have been watertight, we could have towed this thing all the way in, I mean, this is common."  (Doc. 195-11 at 9).  Finally, Mr. Campana testified, "[i]t was an unseaworthy vessel.  It should never have been towed across the ocean.  It should have been picked up way before they left Port Bolivar."  (Doc. 198-4 at 33).

On March 24, 2020, Goodloe brought suit in this Court alleging negligence and gross negligence against CIT (Counts I and II), negligence and gross negligence against BC Towing (Counts III and IV), breach of contract against CIT (Count V), and breach of implied warranty of workmanlike service against CIT (Count VI). (Doc. 1 at 3–8).

On July 17, 2020, CIT filed a Complaint and Petition for Exoneration from or Limitation of Liability in this Court pursuant to 46 U.S.C. § 30501 *et seq.*, seeking exoneration (Count I) and limitation of liability (Count II).  *See Caillou Island Towing Co., Inc. & B.C. Towing, Inc.* v. *Goodloe Marine, Inc.*, 8:20-cv-1641-JLB-AAS ECF 1 (M.D. Fla. July 17, 2020).  That action was consolidated with the case

brought by Goodloe.  (Doc. 33).  CIT also filed a Third-Party Complaint against RJA, who conducted the Trip in Tow Survey, alleging breach of warranty of workmanlike performance and seeking to indemnify CIT for all damages sought by Goodloe. (Doc. 33; Doc. 77).  CIT has since settled with RJA, and RJA has been terminated from the case.  (Doc. 202; Doc. 203).

Goodloe now moves for summary judgment on Counts I and II of CIT's limitation of liability action, arguing that CIT is not entitled to exoneration or limitation of liability.  (Doc. 194 at 13–23).  Goodloe also moves for summary judgment on Count V of its Complaint, arguing that CIT breached its contract with Goodloe.  (*Id.* at 24–25).

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a "genuine" dispute exists if "a jury applying [the applicable] evidentiary standard could reasonably find for either the plaintiff or the defendant" as to the material fact.  *Id.* at 255.  And a "genuine" dispute exists if "a jury applying [the applicable] evidentiary standard could reasonably find for either the plaintiff or the defendant" as to the material fact.  *Id.* at 255.

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . ." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party [and] must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation omitted). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Finally, substantive admiralty law applies here because the sinking of the dredge occurred in navigable waters. *See Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919, 924 (11th Cir. 2001) ("[E]very species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance") (citing *The Plymouth*, 70 U.S. 20, 36 (1866)); *Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358 (11th Cir. 1990) ("Even when the parties allege diversity of citizenship as the basis of the federal court's jurisdiction (as they did in this case), if the injury occurred on navigable waters, federal maritime law governs the substantive issues in the case") (citations omitted); *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law") (citation omitted).

## DISCUSSION

Goodloe moves for summary judgment that (1) CIT is not entitled to exoneration from, or limitation of, liability and (2) CIT breached the towing agreement with Goodloe. The Court takes up each of these arguments in turn.

### I. Goodloe is entitled to summary judgment as to CIT's action for exoneration but not as to CIT's action for limitation of liability.

CIT filed a petition for exoneration from or limitation of liability pursuant to the Limitation of Liability Act, 46 U.S.C. § 30501. *Caillou Island Towing*, 8:20-cv-1641-JLB-AAS, ECF 1. CIT asserts that it is entitled to exoneration under the Limitation Act because they allege that they acted like reasonable, prudent vessel owners, and thus, the sinking of the dredge was not the result of their negligence. (*Id.* at ¶¶ 18, 19). Goodloe now moves for summary judgment that CIT is not entitled to exoneration or limitation of liability because CIT "acted with complete disregard to published weather forecasts and sailed the Tow into unsuitable conditions. CIT had privity or knowledge of such negligence based on its daily communications with the Tug during the voyage, including while the Tow was in Carrabelle awaiting weather." (Doc. 194 at 14).

The Limitation Act gives a vessel owner the right to limit liability for claims of damage or injury from a maritime accident occasioned without the owner's knowledge or privity. 46 U.S.C. § 30523(a), (b). The limit on the claims of damage or injury is the value of the vessel and pending freight. 46 U.S.C. § 30523(a). Actions under the Limitation Act are governed by 46 U.S.C. § 30511, Supplemental

11

Rule F, and Local Admiralty Rule 7.06.  *See In re Petnuch*, No. 3:20-CV-497-J-32PDB, 2020 WL 4206369, at *1 (M.D. Fla. July 22, 2020).

In a proceeding under the Limitation Act, a vessel owner may seek both exoneration from, and limitation of, liability for maritime accidents.  *See In re Skanska USA Civil Southeast Inc.*, 577 F. Supp. 3d 1302, 1313 (N.D. Fla. Dec. 29, 2021) (citing *Beiswenger Enter. Corp. v. Carletta*, 86 F.3d 1032, 1036 (11th Cir. 1996)).  In all Limitation of Liability Act proceedings where both exoneration and limitation are sought, the first inquiry is whether the tug or its owners are liable.  *See Providence & New York S.S. Co. v. Hill Mfg. Co.*, 109 U.S. 578, 595 (1883).  Liability is established where the vessel owner's negligent acts were "a contributory and proximate cause of the accident."  *Hercules Carriers, Inc. v. Claimant State of Florida*, 768 F.2d 1558, 1566 (11th Cir. 1985).  And "[a] shipowner is entitled to exoneration from all liability . . . only when it demonstrates that it is free from any contributory fault."  *Amer. Dredging Co. v. Lambert*, 81 F.3d 127, 129 (11th Cir. 1996); *see also In re Royal Caribbean Cruises, Ltd.*, 55 F. Supp. 2d 1367, 1370 (S.D. Fla. June 18, 1999) ("If there is no evidence of [defendant's] negligence or contributory fault, then [defendant] is entitled to exoneration from all liability.").

The Eleventh Circuit has outlined a two-step analysis to determine whether a shipowner is entitled to receive exoneration or limitation of liability.  *See Hercules*, 768 F.2d at 1563–64.  "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident.  Second, the court must determine whether the shipowner had knowledge or privity of those same acts

of negligence or conditions of unseaworthiness." *Id.*  Moreover, once a claimant satisfies the initial burden of proving negligence or unseaworthiness, the burden of proof shifts to the shipowner to prove the lack of privity or knowledge.  *See Coryell v. Phipps*, 317 U.S. 406, 409 (1943); *Coleman v. Jahncke Service, Inc.*, 341 F.2d 956, 958 (5th Cir. 1965).  If negligence or unseaworthiness is not found—or if it is found but the shipowner did not have knowledge or privity thereof—the petitioner is entitled to a decree of exoneration.  *See Providence*, 109 U.S. at 595; *see also Complaint of Sheen*, 709 F. Supp. 1123, 1128 (S.D. Fla. 1989) ("If negligence or unseaworthiness is found, the court must then determine if the owners are entitled to a limitation of liability").

To defeat a claim for exoneration at the summary judgment stage, therefore, a plaintiff must prove that there is no genuine dispute of material fact that there was some negligence on either the owner's, crew's, or vessel's part, or that the vessel was unseaworthy, and the owner had knowledge or privity thereof.  *See In Re Petition of M/V Sunshine II*, 808 F.2d 762, 764 (11th Cir. 1987).

### A. Summary judgment is due to be granted in favor of Goodloe as to CIT's exoneration claim.

To succeed on a claim of negligence under federal maritime law, Plaintiff must prove: "(1) a duty recognized by the law requiring a certain standard of conduct for the protection of others against unreasonable risks; (2) breach of the duty; (3) a reasonably close causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another." *See*

*Crayton v. Oceania Cruises, Inc.*, 600 F. Supp. 2d 1271, 1275 (S.D. Fla. 2009)

(citation omitted).

> **1.   There is no genuine dispute of material fact that CIT owed a duty to exercise the reasonable care and maritime skill of a prudent mariner under the circumstances.**

As for the duty element in a maritime negligence context, the Eleventh

Circuit has held that:

> the benchmark against which a shipowner's behavior must be measured is *ordinary reasonable care under the circumstances*, a standard which requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition, at least where . . . the menace is one commonly encountered on land and not clearly linked to nautical adventure.

*Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989) (emphasis

added).  "In a contract of towage . . . the tug owes the tow the 'duty to exercise such

reasonable care and maritime skill as prudent navigators employ for the

performance of similar service.'"  *Collier v. 3-A's Towing Co., Inc.*, 652 F. Supp. 576,

579 (S.D. Ala. Jan. 29, 1987) (quoting *Stevens v. The White City*, 285 U.S. 195, 202

(1932)).  The tug also owes the tow the duty to "assess the nature of the undertaking

that it assumes; it must be sufficiently knowledgeable about its vessel, its

customer's ship and the interaction of the two upon the sea . . . ."  *Id.* at 579–80

(quoting *M.P. Howlett, Inc. v. Tug Dalzellido*, 324 F. Supp. 912, 917 (S.D.N.Y.

1971)).  Further, "[a] tug has an obligation to utilize available weather reports in

order to operate in a manner consistent with foreseeable risks, and the Captain of a

tug is chargeable with knowledge of weather predictions, whether he knows of them

or not." *Aiple Towing Co., Inc. v. M/V/ Lynne E. Quinn*, 534 F. Supp. 409, 411

(E.D. La. March 2, 1982). And the failure of a tug to seek safe waters in light of

available weather forecasts predicting high winds and high seas constitutes

negligence. *Id.* at 410–12 (explaining that the captain of a tug was negligent when

he ignored an NWS forecast predicting "shifting winds becoming north to northwest

at 20 to 30 knots at night, seas 5 to 8 feet, and thunderstorms with the wind shift.").

> **2. There is no genuine dispute of material fact that CIT breached its duty of care by sailing the tow into poor weather conditions despite ample forecasts advising such conditions, but there is a genuine dispute of material fact as to whether CIT breached its duty of care by leaving Carrabelle when it did.**

Goodloe has introduced evidence that CIT breached its duty of care by acting

with "complete disregard to published weather forecasts and sailed the Tow into

unsuitable conditions." (Doc. 194 at 14). First, Captain Duzich's Trip in Tow

Survey stated, "[f]avorable weather forecast to be obtained prior to departure from

Carrabelle, Florida Sea Buoy for Boca Grande, Florida" and "[i]dentify ports of

refuge and/or sheltered water, should weather conditions/sea state exceed three (3)

feet during the voyage segment" during the voyage between Carrabelle, Florida and

Boca Grande, Florida. (Doc. 195-9 at 2). Captain Adams was aware of Captain

Duzich's recommendations. (Doc. 195-7 at 43–44). And Captain Taylor testified

that he knew that Captain Duzich's recommendations included obtaining a

favorable weather window before crossing from Carrabelle, Florida to Tampa,

Florida. (Doc. 195-10 at 19).

Further, Captain Shore, an expert in marine surveyor, testified that the tow should not have departed Carrabelle on the morning of January 20, 2020 because he "[didn't] feel that they received sufficient weather forecasts.  And [he] th[ought] there was far more information available to them" and that an NWS forecast of two-to-three-feet seas might be non-compliant with the recommendations made by Captain Duzich.  (Doc. 195-4 at 12).  Captain Shore added in his report, "Captain Taylor's actions and decisions to leave Carrabelle were not those of a prudent mariner . . . . This incident could have been avoided if Captain Taylor had waited at Carrabelle for the weather to abate and follow[ed] the weather recommendations issued by an experienced and professional marine surveyor."  (Doc. 195-5 at 11).

Goodloe has also introduced evidence that various urgent marine weather forecasts were issued on January 21, 2020 advising of seas from four to seven feet in zones of the Gulf where the tow was heading that day.  (*See* Doc. 195-15 at 4–5).  Mr. Dooley, an expert meteorologist, noted that these forecasts were confirmed by Captain Adams and Captain Taylor's reports as Captain Adams stated that there were waves of five to seven feet and Captain Taylor stated three-to-four-foot seas were present during the night.  (*Id.* at 28).  And Mr. Dooley testified that at the time of these urgent marine weather messages, "the forecasts for returning to Carrabelle were more favorable than proceeding toward Tampa."  (*Id.* at 5).

Further, Benton Goodloe testified that:

> the dredge should never have been out there in rough seas . . . I think if they'd have followed all of the recommendations . . . in my opinion they never should have left Carrabelle.  Once they left Carrabelle if the weather got a little crappy they had the opportunity to turn around and

go back.  They had that opportunity.  Once it got a little rough they could have [sought] safe shelter, because . . . I don't think this weather event just came up all of a sudden and got terribly bad in an instant.  I think it was a building thing and they should have known that . . . I don't think it . . . ever should have happened, and I just think they were negligent in not, mainly in getting, you know, a good weather forecast.

(Doc. 195-6 at 23–24).  Benton Goodloe added that he believed CIT was responsible because CIT had the "opportunity to turn around and go back" as they "weren't that far out" in the gulf when the weather began to turn.  (*Id.* at 24)   In sum, Goodloe has introduced considerable evidence to support its contention that CIT breached its duty of care by continue its voyage as planned after receiving the weather forecasts issued by the NWS on January 20th, 2020 and January 21st, 2020.

CIT, meanwhile, has introduced ample evidence that it was reasonable to allow the tow to leave Carrabelle on January 20, 2020.  For example, CIT waited for three days at Carrabelle for a good stretch of weather to make the journey across the Gulf.  (*See* Doc. 195-10 at 19).  Captain Taylor testified that the crew on the Tug had radars, listened to the marine weather forecast, and used the standard weather app on their iPhones to determine whether they had a favorable weather window.  (Doc. 195-10 at 19–20).  And the crew on the Tug checked the weather "both from shoreside and from the vessel crew's perspective" to ensure that they had a favorable weather window before crossing.  (Doc. 195-3 at 34).  The forecast issued by the NWS Tallahassee station before the tow departed Carrabelle on January 20, 2020 advised seas from three to five feet during the day on January 20, 2020.  (Doc. 198-2 at 3).  And forecasts for later that day and overnight advised seas of one to two feet.  (*Id.* at 6–8).  Captain Duzich's recommendation was that they "[i]dentify

Ports of Refuge and/or sheltered water, should weather conditions/sea state exceed three (3) feet during the voyage," so the one-to-two-foot swells were well within this limit.  (Doc. 195-9 at 2).  Furthermore, as Mr. Campana noted, Captain Duzich's recommendation to identify ports of refuge in seas higher than three feet did not mean that if the seas were higher than three feet, the tow could not sail.  (*See* Doc. 195-12 at 6).  It simply meant that in such conditions, the crew on the Tug should identify ports of refuge.  (*Id.*)

Construing these facts in the light most favorable to CIT as the Court is required to do at the summary judgment stage, the Court finds that there is a genuine dispute of material fact as to whether CIT breached its standard of care in taking the tow out from Carrabelle on January 20, 2020.  Thus, proceeding in conditions where seas were predicted to be slightly above three feet was not per se a breach of the "duty to exercise such reasonable care and maritime skill as prudent navigators employ."  *See Collier*, 652 F. Supp. at 579.  And CIT has introduced sufficient evidence that the captains' decision to leave Carrabelle was a discretionary navigational decision made after "assess[ing] the nature of the undertaking" and that they were "sufficiently knowledgeable about [their] vessel, [their] customer's ship and the interaction of the two upon the sea . . . ." *Id.*

But while CIT has introduced evidence that it was reasonable to allow the tow to leave Carrabelle on January 20, 2020, CIT has failed to introduce any evidence that it was reasonable to ignore the urgent weather forecasts issued by the NWS on January 21, 2020 or that it was reasonable to not turn back to calmer

waters on January 21, 2020.  In fact, Defendants' Response contains no mention whatsoever of the urgent weather forecasts issued by the NWS on January 21, 2020 and January 22, 2020.  (*See* Doc. 195-15 at 4–5).  These forecasts reflected sea levels several feet above the three-foot sea levels warned of by Captain Duzich in the Trip in Tow survey.  (*Id.*)  For example, the first urgent marine weather message issued at 3:42 A.M. on January 21, 2020 advised "North winds 20 to 25 kt with gusts up to 30 kt and seas 4 to 7 feet" for the zone which the tow would be approaching later that day.  (*Id.* at 4).  The weather described in these forecasts clearly posed a risk to the tow.  As Captain Shore explained, "If I got a forecast of 2 to 3 [foot sea levels] and the rest of the voyage is 1 to 2 feet, I'd say we should be in good shape.  If I'm getting two to three and I start seeing three to five and then five to seven, of course, that speak for itself.  But it's a no-go."  (Doc. 195-4 at 15).

Captain Shore also suggested that the evidence indicated that the crew aboard the Tug was not properly monitoring the weather, stating, "they've only been into the voyage a short number of hours and they've already hit heavy weather.  They know they've got a five-day trip south.  They . . . should be getting more access to weather.  I don't . . . feel that they got sufficient weather reports."  (Doc. 195-4 at 14).  Benton Goodloe echoed this opinion, noting "I think if they had given [the captain] proper instructions and proper backup or weather or what you will, they never probably would have left the day they left, but after they left, you know, I just think they had equal opportunity to turn around and go back."  (Doc. 195-6 at 24).

And while Captain Taylor testified that the crew listened to the marine weather forecast, (Doc. 195-10 at 19), none of the individuals on board the Tug testified that they had heard, or actively sought out, the urgent marine weather messages from the NWS.  Instead, the testimony from Captain Taylor that the weather "got rough on [them] . . . and then [they] just . . . had to pull into shallow water when . . . the water was getting bad" reflects that the crew was caught off guard by the bad weather.  (Doc. 195 at 21).

While the Court is sympathetic to the variable and fast-changing nature of weather conditions in the Florida Gulf, CIT has introduced no evidence that the crew's failure to heed—or acknowledge—the urgent marine weather messages for the zones of the Gulf towards which the tow was headed was a reasonable decision under the circumstances.  Again, liability cannot be imposed unless CIT has "actual or constructive notice of the risk-creating condition." *Keefe*, 867 F.2d at 1322.  Here, the weather reports issued by the NWS warning of high seas gave CIT just such knowledge.  That CIT did not heed these warnings demonstrates a failure "to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service.'" *Collier*, 652 F. Supp. at 579.

And as noted above, Goodloe has introduced ample evidence that CIT's conduct vis-à-vis the weather reports was not in compliance with the relevant standard of care, which states that "[a] tug has an obligation to utilize available weather reports in order to operate in a manner consistent with foreseeable risks, and the Captain of a tug is chargeable with knowledge of weather predictions,

whether he knows of them or not." *See Aiple Towing Co.,* 534 F. Supp. at 411. Thus, because there is no genuine dispute of material fact that CIT should have, but did not, properly monitor and respond to the weather forecasts advising sea levels well above the tow's freeboard, the Court finds that CIT breached its duty "requiring a certain standard of conduct for the protection of others against unreasonable risks," *see Crayton* 600 F. Supp. 2d at 1275.

Accordingly, while there *is* a genuine dispute of material fact as to whether the crew's decision to leave Carrabelle on January 20, 2020 was a breach of the duty of care owed by CIT, this alone does not counteract the Court's finding that there is no genuine dispute of material fact as to whether CIT failed to properly heed the relevant weather warnings as a prudent mariner would. Thus, the Court must find that CIT breached its duty of care irrespective of the reasonableness of the crew's decision to leave Carrabelle when it did, and summary judgment is due to be granted in favor of Goodloe as to this second element of its negligence claim.

### 3. There is no genuine dispute of material fact that CIT's breach of the standard of care, at least contributorily, caused the dredge to sink.

In order to establish negligence, Goodloe must also prove that CIT's breach of its duty of care *caused* the dredge to sink. *See Crayton*, 600 F. Supp. 2d at 1275 (explaining that the third element of negligence is "a reasonably close causal connection between the conduct and the resulting injury"). Again, liability is established only where the vessel owner's negligent acts were "a contributory and proximate cause of the accident." *Hercules*, 768 F.2d at 1566.

21

Here, Goodloe has introduced evidence that CIT's breach of its duty of care caused the dredge to sink.  Captain Shore testified that "you just don't want to be towing a dredge and an idler barge in seas in excess of 3 feet.  You start getting into moderate to heavy weather . . . it certainly would be a cause for concern." (Doc. 195-4 at 12).  He added that among these concerns was the possibility of wave wash coming across the deck of the dredge causing the dredge to sink.  (*Id.* at 12–16).  This warning was echoed by Benton Goodloe who stated that the vented compartments on the idler barge "[we]re not made for the whole ocean to come over the top of the dredge and completely submerge it with waves."  (Doc. 195-2 at 11).  And Benton Goodloe confirmed these potential adverse effects, testifying that shortly before the dredge sank, his son, who was on the tow, "called [the Coast Guard] on the radio and he told them, you know, you've got some really rough seas out here, you know, we got water coming over the deck."  (*Id.* at 48).  He also testified that "when it got rough it was going over the top of the dredge.  You know, 7-foot seas, you've got a barge there with three or four feet of freeboard, it was going over the decks, over everything, all over everything."  (Doc. 195-6 at 6).  Finally, in CIT's report to the Coast Guard, CIT conceded that the seas were significantly higher than three feet and added that these high seas affected the couplings between the barges, stating:

> Dredge being towed in the Gulf of Mexico by the M/V Charles J. Cenac . . . Seas picked up.  Winds began to blow approximately 40 mph and seas were roughly 7-9 ft.  Action that caused the dredge to sink: Dredge situated on 2 barges that were connected together by pipes welded with couplings on each side to allow for movement with the seas.  The coupling at the stern barge failed . . . [t]he dredge partially sank.

(Doc. 195-16 at 2).  In sum, Goodloe has introduced significant evidence that CIT knew that the dredge was vulnerable to waves above three feet, CIT failed to properly monitor weather reports advising seas of four to seven feet, seven-foot seas occurred, and the dredge sank after being exposed to such waves for hours.

For its part, CIT points to record evidence that the dredge sank because the tow was unseaworthy.  (*See, e.g.*, Doc. 198-5 at 87; Doc. 195-3 at 35; Doc. 195-11 at 9; Doc. 198-4 at 33).  But CIT has not introduced any evidence that unseaworthiness *alone* was the cause of the sinking of the dredge.  For example, Mr. Cenac, the President of CIT, (Doc. 195-11 at 4), stated in response to an interrogatory that at the time the dredge sank there were "winds of 30 to 40 miles per hour and seas of three to five feet, with occasional swells of seven feet . . . [and] it is believed that weather conditions combined with the unseaworthy condition of the tow, contributed to the sinking of the tow."  (*Id.* at 15).  And the record is replete with evidence that the tow was not so unseaworthy that the slightest wave above three feet would have caused the dredge to sink.  First, at the time the dredge sank, the tow had already made a several hundred-mile journey from Texas to Florida.  Second, the tow did not immediately sink when it was exposed to high sea levels; instead, it survived hours and hours while being pummeled by waves anywhere from one foot to three feet above its freeboard.  Third, the tow was inspected by Captain Duzich before he issued his Trip in Tow recommendations, and Captain Duzich did not identify any notable vulnerabilities with the tow.  Finally, neither

23

Captain Adams nor Captain Taylor found in their pre-voyage preparations that the tow was unseaworthy.

Accordingly, while unseaworthiness may have contributed to the dredge's sinking, there is no dispute of material fact that unseaworthiness was not the *exclusive* cause of the sinking.  Instead, the sinking of the dredge was caused at least in part by CIT's failure to exercise reasonable care with respect to the marine weather forecasts advising seas of four to seven feet in a zone of the Gulf through which the tow would be traveling.  This is "a reasonably close causal connection between the conduct and the resulting injury" satisfying the causation element of a maritime negligence claim.  *See Crayton*, 600 F. Supp. 2d at 1275.  Because liability is established where the vessel owner's negligent acts were "a contributory and proximate cause of the accident," *Hercules*, F.2d at 1566, the Court finds that CIT is at least partially liable for the sinking of the dredge.

### 4. There is no genuine dispute of material fact that Goodloe suffered damage to its dredge.

The final element in a negligence claim is damages.  *See Crayton*, 600 F. Supp. 2d at 1275.  Here, it is uncontested that the dredge sank.  Accordingly, Goodloe has established the four elements of negligence without any genuine dispute of material fact, and thus, as a matter of law, CIT was at least contributorily negligent.  *Hercules*, 768 F.2d at 1563–64.  The Court therefore finds that Goodloe is entitled to summary judgment as to CIT's exoneration claim.

### B. Goodloe is not entitled to summary judgment as to CIT's limitation of liability claim.

Having granted summary judgment for Goodloe as to CIT's claim for exoneration of liability under the Limitation Act, the Court turns to the second facet of CIT's claim—limitation of liability—to determine whether CIT is able to limit its liability to the value of the vessel. *See Beiswenger Enter.*, 86 F.3d at 1036. To do so, CIT must demonstrate that it had no knowledge of the asserted acts of negligence or that it was not in privity with them. *Id.* The burden of proof is on CIT to show it lacked knowledge or privity. *See Coryell*, 317 U.S. at 409. "[K]nowledge is not only what the shipowner knows but what he is charged with discovering in order to apprise himself of conditions likely to produce or contribute to a loss." *Hercules*, 768 F.2d at 1564. In the context of a corporate vessel owner, "privity or knowledge" means the privity or knowledge of a managing agent, officer or supervising employee. *Id.*; *see also In re Signal Int'l, LLC*, 579 F.3d 478, 496 (5th Cir. 2009) ("A corporation is charged with the knowledge of any of its managing agents who have authority over the sphere of activities in question.") (citation and quotation marks omitted).

Here, Goodloe introduced evidence that prior to departing Carrabelle, Mr. Arcement, a managing agent at CIT, was in contact with the crew on the tow about the best time for the tow to leave and maintain a window of good weather. (Doc. 195-7 at 64–65). Mr. Arcement stated that he was asking Captain Adams about the weather to review the information "in support of his go-no-go decision" and because he "want[ed] to have . . . [his] eyes on the same information to ensure the spirit of

25

[Captain Duzich's] recommendations w[as] being followed." (*Id.* at 66).  While this level of involvement in Captain Adams's decision-making would certainly constitute privity or knowledge, as the Court determined above, the crew's decision to depart Carrabelle on the day it did may not have been negligent.  Thus, these communications alone are insufficient to support summary judgment in favor of Goodloe on CIT's limitation of liability claim.

As far as the communications between CIT and the tow's crew while the tow was en route from Carrabelle to Boca Grande, the extent of CIT's involvement in the day-to-day navigational decisions of the tug is uncertain.  On the one hand, Goodloe has introduced testimony from Mr. Arcement that CIT provided sea state reports twice a day to the tow, and Mr. Arcement talked on the phone with crew on the tow to get the tow's position and then emailed Goodloe a report on the tow's position along with a weather report.  (Doc. 195-3 at 17).  But Goodloe has not introduced any evidence that Mr. Arcement, or any staff at CIT who were not on the tow, were directing the tow and telling the tow to proceed with respect to the weather reports that CIT was sending.  Accordingly, there is a genuine dispute of material fact as to whether CIT's managing agents had knowledge of or privity to the navigational decisions being made by the crew on the tow.  Because these navigational decisions form the crux of CIT's negligence—described above—the Court cannot grant summary judgment in favor of Goodloe as to CIT's limitation of liability claim.

## II.  Goodloe is not entitled to summary judgment that CIT breached the towing agreement.

Goodloe next argues that because "CIT failed to tow Goodloe's equipment to its final destination, and instead sank the Dredge," CIT breached its towage contract with Goodloe. (Doc. 194 at 24–25). A breach of contract claim in the maritime context requires that the plaintiff "prove (1) the terms of a maritime contract; (2) that the contract was breached; and (3) the reasonable value of the purported damages." *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005). A tug which enters into an agreement to tow a vessel is bound use reasonable care in providing its towing services. *See Collier*, 652 F. Supp. at 579. Further, "[t]he tug's duty to the tow 'includes the requirement to assess the nature of the undertaking that it assumes; it must be sufficiently knowledgeable about its vessel, its customer's ship[,] and the interaction of the two upon the sea." *Id.* at 579–80.

At the same time, the owner of the tow has a duty to furnish a seaworthy vessel. *King Fisher Marine Service, Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1183 (5th Cir. 1984). "[T]he obligation to provide a seaworthy vessel goes beyond providing a structurally sound one. The duty requires the tow owner to prepare the vessel, including its appurtenances, in such a way that the tug operator will be able to successfully negotiate the conditions and obstacles that the tow will encounter." *See Arkansas State Highway Comm'n v. Arkansas River Co.*, 271 F.3d 753, 760 (8th Cir. 2001). And just because a vessel "would float does not mean it was adequately prepared for its intended journey." *Id.*

But a "tug cannot complain about a condition of unseaworthiness or other weakness that caused the loss if it knew [or had reason to know] of the condition and failed to use reasonable care under the circumstances." *King Fisher Marine*, 724 F.2d at 1184.  If the alleged unseaworthiness of the tow is so apparent that it would be negligent for the tow to attempt to proceed, the tug cannot disclaim responsibility for the loss. *King Fisher*, 724 F.2d at 1183.  "Only in this narrow circumstance does the law require a tug operator to protect the tow or its cargo from loss caused by an unseaworthy condition." *Arkansas*, 271 F.3d at 759.

Here, there is no dispute that a valid and enforceable maritime contract existed between Goodloe and CIT for the tow.  (Doc. 195-1).  There is also no dispute that because the dredge sank, it was not towed to its final destination and thus, the contract was not fulfilled.  Finally, it is undisputed that the towing agreement is silent as to the tow's purported seaworthiness, as well as which party is to be held liable for damage caused to the tow as a result of unseaworthiness or negligence. (*See* Doc. 195-1).  What is disputed is the cause of the sinking and whether CIT's failure to deliver Goodloe's equipment to its final destination because of that sinking constitutes a breach of contract.

CIT has introduced evidence that Goodloe did not furnish a seaworthy tow and thus, Goodloe is at least partially liable for the sinking of the dredge.  (*See* Doc. 198 at 19–20).  For example, Mr. Karentz testified "when the vessel left Carrabelle, without any doubt whatsoever, the decks were not in a seaworthy condition. Meaning there were exposed openings that would allow flooding of the

28

compartments.  The hatches were not watertight." (Doc. 198-5 at 87).  Mr. Karentz added that the condition of the tow meant that water that got on deck could not properly drain off because "flooding doesn't relieve itself.  It doesn't go away unless you start pumps and dewater the vessel." (*Id.*)  And Mr. Cenac, the President of CIT, testified that, "[i]n this particular case, this thing sunk like a brick.  There was no compartment that was watertight.  If this thing would have been watertight, we could have towed this thing all the way in, I mean, this is common." (Doc. 195-11 at 9).  Mr. Cenac added that the coupling between the barge and the dredge was also not seaworthy for the voyage because "if you had looked at where his ball and joint sockets were at, they only had the top and the sides with a plate welded into the barge.  They never had a bottom piece of plate welded to the bottom of the barge." (*Id.* at 13–14).  Finally, Mr. Campana testified that "[i]t was an unseaworthy vessel.  It should never have been towed across the ocean.  It should have been picked up way before they left Port Bolivar." (Doc. 198-4 at 33).  According to Mr. Campana, the barge had a number of holes and defects that made it susceptible to flooding. (Doc. 195-12 at 10).

But Goodloe has introduced evidence that the tow *was* in seaworthy condition.  For example, Benton Goodloe, Goodloe's Project Manager, testified, "I think by us getting the marine surveyor out there and doing our inspections and all of that, I think that it was . . . safe to leave on tow if the conditions of the Trip in Tow Certificate were followed." (Doc. 195-2 at 20).  And when asked if he tried to determine the cause of the sinking, Benton Goodloe added, "[i]t was pretty apparent

to me it was the weather.  It was really, really rough.  You know, I could hear stuff banging around on the dredge, pipes swinging around, banging into things, and I could hear the wind in the phone." (*Id.* at 47).  Mr. Shore added in his report that "[t]he dredge and idler barge were seaworthy and fit for their intended voyage and it was not until Caillou Island Towing Company Inc., towed the dredge and idler barge in unsuitable weather condition that a problem existed." (Doc. 195-5 at 9). And Captain Duzich, who conducted the Trip in Tow Survey, testified that part of his inspection included inspecting the connections between the tug and the tow as well as surveying whether the tow itself maintained watertight integrity, and he would not have signed off on the survey if Goodloe's dredge and barge were not seaworthy or were unfit for their intended purpose.  (Doc. 195-7 at 29–31).  Goodloe has also introduced evidence that the dredge was inspected in 2018 and that inspection confirmed that the vessel was "[i]n apparent good condition fully found to put in man for its intended service." (Doc. 195-12 at 16–17).

And as to the question of whether the alleged unseaworthiness of the tow is so apparent that it would be negligent for the tow to attempt to proceed, several witnesses testified that the defects allegedly causing unseaworthiness were not necessarily visible to the captain of a tug doing a pre-voyage inspection.  For example, Mr. Campana stated, "[t]he captain of a tug when he takes a tow has a precursory responsibility to do a walk-around . . . many times, you can't access the interior of the hull of the barge, so you couldn't go in to look.  [The captain of a tug] has a presumption that the owner is presenting him a seaworthy item." (Doc. 195-

12 at 19).  And Mr. Duzich stated that if the barge had a hole in it, the existence of that hole would have been readily apparent because air bubbles coming from the hole would have been visible "as that air is being displaced out of that void or tank or compartment."  (Doc. 195-7 at 52).  Accordingly, it is not clear from the evidence that CIT had reason to know about the alleged defects in the barge such that it would have been unreasonable to undertake the voyage.

In sum, there is a genuine dispute of material fact as to whether Goodloe fulfilled its obligation to provide a seaworthy vessel, and there is a genuine dispute of material fact as to whether CIT had reason to know of the allegedly compromised condition of the vessel and failed to use reasonable care under the circumstances. *See King Fisher Marine*, 724 F.2d at 1183.  These disputes of fact preclude this Court from entering summary judgment in favor of Goodloe on its breach of contract claim because if the dredge sank due to the tow's unseaworthiness and CIT had no reason to know the tow was unseaworthy, CIT did not breach the towing agreement by failing to tow the dredge to Port St. Lucie.  Accordingly, summary judgment is denied as to Goodloe's breach of contract claim.

## CONCLUSION

For the foregoing reasons, the Court finds that Goodloe's Motion for Partial Summary Judgment (Doc. 194) is **GRANTED in part** and **DENIED in part**. Specifically, Goodloe is entitled to summary judgment as to CIT's exoneration claim because there is no genuine dispute of material fact that CIT was at least contributorily negligent in its failure to heed relevant weather warnings, but

Goodloe is not entitled to summary judgment as to CIT's limitation of liability claim and Goodloe's breach of contract claim.

  **ORDERED** at Tampa, Florida on June 28, 2023.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE